FILED
U.S. DISTRICT COURT

2005 OCT -5  P 3: 33

DISTRICT OF UTAH

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| FRANCIS E. LEWIS, | : | Case No. 2:04-CV-00650 TC |
| Plaintiff, | : | |
| | : | REPORT AND RECOMMENDATION |
| vs. | : | REGARDING PLAINTIFF'S APPEAL OF THE COMMISSION'S |
| JO ANNE B. BARNHART, | : | DENIAL OF SOCIAL SECURITY |
| Commissioner of Social | | BENEFITS |
| Security, | : | |
| | | Judge Tena Campbell |
| Defendant. | : | |
| | | Magistrate Judge Brooke C. |
| | : | Wells |

This matter came before Magistrate Judge Brooke C. Wells
pursuant to 28 U.S.C. § 636(b)(1)(B) from a referral by Judge
Tena Campbell.

The court has carefully reviewed the pleadings and finds
oral argument would not materially assist in this determination.
For the reasons set forth below, the court concludes that there
is not substantial evidence in the record to support the decision
of the Administrative Law Judge (ALJ) and Commission.
Accordingly, it is recommended to the District Court that Mr.

Lewis' appeal be granted and the case remanded to the ALJ for further proceedings consistent with the Court's recommendation and an award of benefits if appropriate.

## STANDARD OF REVIEW

Review of the Commissioner's decision is limited to determining whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied.[1]  The record must be examined closely to determine whether substantial evidence supports the [Commissioner's] determination.[2]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[3]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[4]  The court may neither re-weigh the evidence nor substitute its discretion for that of the Commissioner.[5]  Where

---

[1]See Castellano v. Secretary of Health & Human Services, 26 F.3d 1027, 1028 (10th Cir. 1992); Hamilton v. Secretary of Health & Human Services, 961 F.2d 1495, 1497-98 (10th Cir. 1992); 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 402 (1981).

[2]See Winfrey v. Chater, 92 F.3d 1017, 1019 (10th Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).

[3]See Hamilton, 961 F.2d at 1498.

[4]See Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).

[5]See Hinkle v. Apfel, 132 F.3d 1349, 1351 (10th Cir. 1997); Kelly v. Chater, 62 F.3d 335, 337 (10th Cir. 1995).

the evidence as a whole can support either the agency's decision or an award of benefits, the agency's decision must be affirmed.[6]

## **PROCEDURAL HISTORY**

This is an appeal from the denial of Plaintiff-Claimant's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § § 401-433.  (R. 58-60).[7] The claim was denied initially and upon reconsideration.  (R. 43-50).  A hearing before the Administrative Law Judge (ALJ) was held January 8, 2003.  (R. 264-290).  On January 26, 2003, the record was supplemented with two additional medical reports.  (R. 255-259;16F).  In a decision dated April 14, 2004, the ALJ determined Mr. Lewis was not disabled within the meaning of the Social Security Act.  (R. 11-21).  The Appeals Council received a supplemental legal memorandum alleging legal errors by the ALJ; additional review of the ALJ's decision was denied.  (R. 5-9, 260-263).  Thus, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.  See 20 C.F.R. §§ 404.981, 416.1581.

_____

[6]See Musgrave v. Sullivan, 929 F.2d 534, 536 (10th Cir. 1990).

[7]References in the text designated "R." refer to the Official Record as a whole and include references to the transcript of the hearing held before the ALJ as well as to exhibits.

Mr. Lewis appeals from the ALJ's final decision.  He alleges the ALJ erred in finding Claimant met the requirements of the act for only a closed period of time following the on-set of his disability and by failing to give appropriate weight to the opinion of Claimant's treating physician/surgeon that Claimant was disabled and unable to perform any work.  Lewis further alleges the ALJ erred in improperly evaluating Claimant's credibility; improperly determining his residual functional capacity (RFC); and in making findings unsupported in the record as to Claimant's ability to perform sedentary work.

## STATEMENT OF FACTS

At the time of filing his appeal, Mr. Lewis was 34 years old, married and had a three year old daughter and a one year old son. (R. 37, 103, 268).  He resided with his family in an apartment in Orem, Utah.  (R. 103).  Claimant had completed more than three years of higher education but was several credits short of receiving a university degree.  (R. 268).

Prior to 1999, Claimant worked as a technical support employee, customer service representative, fast food service employee, pet store salesperson, bulk delivery warehouse worker, data entry clerk, past-due accounts manager and laborer.  (R. 81-89).

4

In April, 1999, Claimant suffered a back injury necessitating surgery, a discectomy at L5-S1 performed in November, 1999.[8]   (R. 271-272).

After recovering from the November, 1999, surgery and until January, 2002, Lewis worked full-time as a tow truck driver and supervisor/manager for a towing company where he was involved in a full range of physical activities.  (R. 81-82).

Mr. Lewis suffered a non-work related fall in November, 2001 which resulted in further injury to his back.  (R. 101,272). After the fall and due to increasing lower back pain radiating into his hips and legs, Claimant's work schedule was first reduced to 4 hours a day, then to 2 ½ hours a day.  (R. 272-273).  He stopped working for the towing company on January 25, 2002, the date his alleged disability began.  (R. 34, 179).  Based on the information included in the court record, Claimant has not worked since that time.  (R. 101, 267).

Mr. Lewis has had two subsequent back surgeries, both in 2002, the last one necessitating a L5-S1 complete discectomy and lumbar fusion.  (R. 172, 274-275).

Since the 2002 surgeries, Claimant's activities have been limited due to back, hip and leg pain, an inability to bend

---

[8]A discectomy is a surgical process in which degenerative disc material is removed from the body and replaced with a bone graft.

forward and down or to pick up items or his children.  (R. 109, 277).  His usual daily activities include attending to his personal needs, running occasional errands and caring for his children during the day while his wife works (although she prepares meals and baby bottles before work).  (R. 76, 105, 277-278).  According to Lewis' wife, he handles most of his childcare responsibilities from his recliner.  (R. 72).  He cannot bathe the children, play with them on the floor or pick them up.  (R. 70, 73).  Lewis is unable to carry or put away heavy groceries, stoop or do household chores of more than a few minutes duration or that involve bending over.  (R. 160, 277, 280).  He takes longer to complete personal care, cannot engage in meal preparation for more than 30 minutes at a time, usually wears slip-on shoes, can go to church for a maximum of 30 to 45 minutes, and cannot engage in outdoor activities or do repairs.  (R. 135, 138, 152, 160).  Paperwork is done from a folding table that sits over the reclining portion of the couch.  (R. 76).

In his testimony, Claimant described everyday pain as generally "3 or 4" on a scale of "10", with spikes to "10" several times a day.  (R. 179, 275).  He described the pain as worse since the last surgery.  (R. 275).  During the hearing, Claimant reported his pain level as a "5" due to the length of time he remained seated before and during the hearing.  (R. 280).  During the hearing, Lewis asked to stand.  (R. 284).  In his written

6

letter appealing the decision of the ALJ to the Commissioner, Claimant described his usual pain level as a constant "4 or 5." (R. 70). He described his pain as getting "worse and worse and worse." (R. 276).

Medications prescribed include Oxycontin, up to 20 mg. tablets, two times per day; Hydrocodone (generic for Lortab), one 650 mg. tablet, one to two times per day; Skellaxin/Tizanidine, two 400 mg. tablets three times per day; MS contin, 15 mg. tablet, one time per day; and soma, 350 mg., one tablet at night. (R. 63, 274-276). Dosages have been periodically adjusted as needed for increased pain. (R. 72, 107, 275-276). The Claimant supplements his narcotic pain medications with Ibuprofen. (R. 71, 275). Claimant had previously taken Celebrex and Vioxx but stopped. (R. 76). Mr. Lewis expressed concerns about becoming addicted to the medications. (R. 175, 239, 275).

Mr. Lewis is "fuzzy" when his medications are in full effect. (R. 282). He takes narcotic medications at least twice a day, including an early morning dosage while caring for the children. (R. 278, 281-282). He finds himself fumbling for words and is not as "coherent" as he used to be when reading. He becomes easily distracted when reading requiring him to often reread. (R. 282).

Claimant reports he is able to occasionally lift up 10 to 20 pounds, sit for up to six hours in an eight-hour period although

7

his ability to sit is limited to two to three hours at a time, and he must periodically alternate sitting and standing to relieve pain. (R. 139, 160-169, 273, 280-281, 284). When not attending to the children, Mr. Lewis must lie down on the bed or couch or be in a recliner.[9] He estimated he must recline 60% of the day. (R. 160, 280-281). If he over-exerts, Claimant's condition is exacerbated. (R. 70, 277, 279-281).

Based upon physical limitations, the need for narcotic medications, medication side effects and the continuing pain associated with his back, Mr. Lewis claims disability.

## Medical Evidence and Symptoms

Mr. Lewis challenges the conclusions of the ALJ reached at steps one, three and five of the required sequential evaluation. Therefore, the medical summary is limited to evidence relevant to those steps of the evaluation process at the time of the hearing and as supplemented to the appeals council: whether Claimant was disabled for the requisite period of time; whether Claimant is disabled within the meaning of the Act; and if not, whether Claimant is capable of performing work available in significant numbers within the national economy.[10] Further, because Claimant's

---

[9]It is unclear from the record whether time the Claimant spends in the recliner is also counted as time spent sitting up.

[10]The Court finds it is necessary to cite lengthy portions of medical treatment notes in the body of this Report and Recommendation in order to accurately reflect medical impressions of the doctors.

8

arguments to this court do not rely on his conditions of obesity or sleep apnea as qualifying disabilities either independently or in combination with his back condition, the medical evidence related to those conditions is not recited except as it may relate to specific legal arguments raised.

Between May, 1999, and November, 2002, Claimant underwent three back surgeries, two discectomies and a fusion.  Two of the surgeries occurred in 2002, in May and November.

After the initial injury in 1999, Mr. Lewis was diagnosed by Dr. William Bacon with a herniated disk in the L5-S1 joint with a shallow L4-5 central herniation.  (R. 81, 94, 125, 144).  On May 10, 1999, Mr. Lewis underwent his first back surgery, a discectomy at L5/S1 performed by Dr. Bacon.  (R. 81, 94, 110).   Mr. Lewis appeared to have recovered well from the injury and initial surgery, and he returned to full-time work.  (R. 70, 72, 152, 179, 272).

In November, 2001, Mr. Lewis re-injured his back in a fall.  (R. 125, 152, 272).  He complained of increasing back, hip and leg pain.  (R. 125, 152, 179).  Dr. Bacon, whom Claimant again consulted with in January and February, 2002, recommended additional time spent with "conservative care" and weight loss.  (R. 101, 127, 128, 272).  Claimant received a series of epideral injections as well as physical therapy which did not ease the pain or increase movement.  (R. 125-126, 158, 273).

9

Claimant then consulted with Dr. Valton N. King, D.O. (R. 136). A March 12, 2002, EMG ordered by Dr. King showed bilateral lumbar radiculopathy at L5-S1. (R. 141, 144, 145; 6F/7). Dr. King's treatment notes reflect Claimant's severe back and leg pain persisted despite proper use of strong pain medications. (R. 136). Based on EMG and MRI findings and concluding "surgeries as [the] best option for pain control and better function," Dr. King referred Claimant to Dr. Howard Reichman, a neurosurgeon. (R. 136, 139, 149, 153, 155).

Dr. Reichman's care of Claimant began a month later in April, 2002. The last treatment notes of Dr. Reichman included within the official court record are dated December 22, 2003, reflecting a continuous treatment period of 20 months as of the time of the hearing. (R. 179, 239).

Mr. Lewis was first examined by Dr. Reichman on April 25, 2002, at which time pertinent medical records including previous MRI results were reviewed. (R. 179). In his April 25, 2002 treatment notes, Dr. Reichman included the following:

> Present Illness
>
> . . . [H]e has less numbness than last time, but more pain. The pain is now everyday. He has been off work now for three months. He has not been able to return to work despite giving it three months rest. (Emphasis added). He has had to take OxyContin two or three times a day everyday. The farthest he can go apart [sic] is 12 hours because of the pain. His wife who was with him today said that he is really quite sedentary secondary to the pain.

Dr. King has been treating him very well in a
conservative fashion, but unfortunately it just
has not gotten better.

Laboratory Data

He [sic] has an MRI scan which shows a very
settled L5-S1 level, complete obliteration
of the foramen on the right side at L5-S1.
Some of this is from recurrent disc [sic]
and the other is from the settling, but the
end result is that the foramen is very tight.
This fits perfectly with his symptoms. . . .

Medical History

His past medical history for the most part is
unremarkable. He is obese. He weighs 320
pounds, but he cannot exercise secondary to
the pain to try to control the weight,
although he realizes in the future that will be
absolutely necessary. . . . (Emphasis added).

Impression and Plan

This patient cannot work. (Emphasis added).
He has a persistent S1 radiculopathy which is
requiring daily narcotics. I have suggested
that he consider decompressing this. I may be
able to get away with just a discectomy, but
he may require a fusion seeing as how he is
overweight, and this is the second time in and
that foramen is so tight. I have talked very
plainly with him regarding the possibility and
made it clear that he has to get his weight
down if he has any hope of having a decent
future with regard to his spine . . . The
recuperation is a lot shorter if we can get by
with a discectomy rather than a fusion, but
obviously the amount of mobility and facet
integrity at the time of surgery will dictate
that course. . . .

(R. 110-111, 135, 172, 181, 184-189; 6F/21;9F/11-13).

On May 24, 2002, Dr. Reichman performed the second discectomy

at L5-S1. (R. 110, 273; 184-189; 9F/9-10). A subsequent

11

treatment note generated by Dr. Reichman from a June 25, 2002

post-surgical examination states in pertinent part:

> Going back to work for the towing company,
> because of the heavy lifting involved and the
> bending if that is something that he can
> tolerate then that would be okay [sic], but
> typically, this heavy-type work is something
> that people tend to have difficulties with.
> Right now, he doesn't even know if he still
> has a job at that company. <u>He states he is
> going to start looking for work elsewhere</u>.
> (Emphasis added).

> <u>I told him that if the medications allow him
> to be more active, then that is acceptable,
> but he wants to try and get off the medication</u>.
> <u>He will start to wean down over the next month
> . . . . We will be able to follow up with him at
> his next appointment. . . . If the symptoms that
> he has been experiencing increase he should call
> our office, otherwise, we expect that he will
> continue to improve with time</u>.   (R. 175).
> (Emphasis added).

By August, 2002, Claimant reported to Dr. Reichman he was

having increasing back pain which, when severe, radiated into his

legs.  (R. 174, 273).  Dr. Reichman ordered a new MRI to determine

if there was a herniated disk or a slippage necessitating a

fusion.  (R. 174).  The MRI showed a right posterolateral disc

herniation with a possible free fragment impinging on the S1 nerve

root.  (R. 110, 135, 173; 3E; 6F).

In a November 21, 2002 letter made part of the official court

record and addressed "To Whom it May Concern," Dr. Reichman

writes:

> [Lewis] had a discectomy at L5-S1 . . . . He
> had re-herniated the disc and Dr. Reichman

12

had operated on it in May of 2002 [sic].
[Lewis] has had continuing low back pain
because of this, with the pain getting
steadily worse.  It was noted in May that
it was very large [sic] fragment, putting a
lot of pressure on the nerve.  We were hoping
with conservative management [Lewis] would
continue to recover, but he has not.

. . . . [Lewis] will be undergoing an
L5-S1 complete discectomy and lumbar fusion
with Blackstone pedicle screws and rods, this
will be done November 27, 2002. [sic] It is
unlikely [Lewis] will be able to return to work after
this.  He should be off for at least the first
three months, it is not likely that he would
even be able to tolerate sedentary. [sic] Depending
on how he responds to the surgery is how we
will know if he will even be able to return
back to gainful employment.  (Emphasis added).

We will be following up with him at one month,
three months, and six months.  We will be better
able to give what restrictions he will have at
that time, but because of the pain now we would
recommend that he be off for at least three
months. . . . (Emphasis added).  (R. 172).

Although preferring to avoid further surgery likely to
involve a fusion and in favor of weight loss, Dr. Reichman
performed Claimant's third back surgery on November 27, 2002.
The surgery involved an L5-S1 complete discectomy and lumbar
fusion with insertion of Blackstone pedicle screws and rods.  (R.
110, 172, 173, 181, 186-187, 274).

As of March 18, 2003, Mr. Lewis was again reporting
increasing back pain.  Dr. Reichman's treatment notes state:

[Lewis] has had a difficult time financially,
he is applying for Social Security, and with as
much pain as he is continuing to have and the
difficulty he has sitting for any long period of

13

> time, I am not aware of any occupation that I
> can think of that he could be gainfully employed
> at this point. [sic] He is looking into Social
> Security and the hearing for that might be sometime
> in September.  We will see him back before that
> time and get a better feel for how [sic] is doing
> physically.  (Emphasis added).

(R. 245).

As of June 24, 2003, Dr. Reichman noted that Mr. Lewis'

incapacitating pain was better and the fusion solid.  He noted

that Claimant "could sit only about 15 to 20 minutes depending

what chair he is on." (R. 242).  Dr. Reichman recommended an

exercise program to increase endurance and a further office visit

in three months.  (R. 242).

On September 23, 2003, Claimant reported back pain and

increasing pain in his legs despite having lost 40 pounds.  Rather

than taking 20 mg. of oxycontin followed by two additional doses

of 10 mg each, Dr. Reichman modified the medications to two daily

doses of 20 mg., at 7:00 a.m. and 7:00 p.m.  (R. 240).

Dr. Reichman's last treatment note is dated December 22,

2003, approximately 2 weeks before Claimant's January 8, 2004

hearing before the ALJ.  According to Dr. Reichman:

> [Lewis] continues to have a lot worse
> pain since October, and he just hasn't
> been able to ease it back down the way it
> was before.  Before he was able to at
> least do some core muscle strengthening
> and now he is unable to go at all because
> of the pain, [sic] it is in his back, it
> radiates down the legs.  He is still trying
> to lose weight . . . but it is to the point
> where he is getting tired of the drugs,

14

tired of the pain, and he wants to see if
there is anything else we can do. . . .

(R. 239).  Dr. Reichman referred Claimant to Dr. Joseph R.
Watkins, M.D., for a further lumbar myelogram and nerve
conduction/EMG study.  (R. 65, 239).

Post-hearing, the ALJ received Dr. Watkins' summary of the
results of nerve and EMG studies which indicated an abnormal EMG
study of the right lower extremity and of the left lower
extremity.  (R. 255-259).

Efforts at physical therapy as well as receipt of epidural
injections have historically proved unsuccessful.  (R. 128, 149,
152, 157-159, 173; 7F).  At one point physical therapy was
stopped as it was possibly aggravating Mr. Lewis' condition.  (R.
101, 110, 157).

In addition to and aggravating his back problems, Claimant,
who has weighed between 320-360 pounds during the periods of
injury, surgery, and recovery, has been repeatedly diagnosed as
obese or morbidly obese.  (R. 127, 128, 152, 174-175, 239).
Doctors and therapists have consistently advised Mr. Lewis to
increase his exercise in order to lose weight and reduce the
pressure on his back.  (R. 128, 143, 145, 160, 173).  He has had
some moderate success in weight reduction when able to exercise.
(R. 153, 239).

15

Mr. Lewis has also been diagnosed with sleep apnea for which he has had surgery and uses a C-PAP machine at night.  (R.  112-122).

The official court record reflects no requests by the ALJ or Commissioner for independent physical examinations by agency medical consultants or for any follow-up information, clarification or testimony from any treating physicians.

**Vocational Expert's Testimony**

The ALJ received testimony from Terri I. Marshal-Gilfillan, a Vocational Expert ("VE").  (R. 51-54, 284-290; 2B). The VE stated she had reviewed the vocational information in Claimant's file regarding his age, education, training and work experience.  (R. 284).

A series of hypothetical questions was asked of Ms. Marshal-Gilfillan.

Ms. Marshal-Gilfillan was asked by the ALJ to assume a thirty-four year old individual with three years of college and past work experience as indicated by Claimant.  The individual would have the skills associated with those positions, could occasionally lift up to 20 pounds, is limited to a total standing and walking time of about two hours thereby reducing the possible work to sedentary, could sit about one hour at a time, stand 15 minutes or walk up to 30 minutes at one time.  The VE was further asked to assume that over the course

16

of an eight-hour work day, the person could sit a total of six
hours with two hours of combined standing/walking.  The
individual would need to lie down for pain relief a total of one
hour over part of the morning, part of the afternoon, during 15-
minute breaks and during the lunch period.  The individual's
concentration level would be mildly reduced due to the effects
of medication or of constant pain.  The individual should avoid
hazardous work and should avoid more than occasional bending,
twisting or stooping.  (R. 286-287).  Acknowledging that the
individual would be limited to sedentary work and the need for
alternative sitting and standing, the ALJ asked the VE if such
an individual would have transferable skills.  (R. 287).  The VE
responded that skills as a truck driver were not transferable.
The VE further stated that because other past work was unskilled
in nature, there were no other transferable skills.  (R. 288).
The ALJ then asked if there was unskilled work that would be
consistent with the required limitations existing in significant
numbers in the national economy which could be performed on a
full-time basis over a sustained period of time.  The VE
testified such jobs, a portion of which would be available with
an alternate sit/stand/walk requirement, are available:  charge
account clerk, DOT 205.367-024 of which there are 70,000 to
80,000 positions available; order clerk, DOT 209.567-014 of
which there are approximately 10,000 positions available; and

17

office helper, DOT 239.567-010 of which there are 140,000

positions available.  (R. 288-289).  The VE then indicated "I

would reduce that by probably 75 to 80 percent."  (R. 289).

In a subsequent hypothetical the ALJ asked the VE to assume

the pain previously described would require the individual to

lie down two hours during the typical workday with an hour to an

hour and one half accommodated during the lunch period and

breaks with the remainder "fit in somehow" during the work day.

(R. 289).  The VE was asked what the effect would be of the lie

down requirement on the three identified jobs or other full-time

work over a sustained period of time.  (R. 289).  In response,

the VE stated, "Having to be away from the work station for

longer than his scheduled breaks would probably preclude all

work in a full-time capacity."  (R. 289).

In response to a question posed by Claimant's attorney as

to how many absences would be tolerated in the unskilled,

sedentary jobs described as available, the VE responded,

> I think that with those-with that additional
> limitation, we would probably be looking at
> again reducing the number of jobs that would
> be available for someone with that many, but
> after 24, it won't be tolerated". . . . "That's
> the max, 24 a year."  (R. 289-290).

No follow-up or clarifying questions were asked.

## Other Evidence Contained in Record

A Utah DDS Case Summary prepared in conjunction with a

prior adjudication of an application for benefits dated

September 30, 2002, concludes Mr. Lewis' allegations are

18

"inconsistent with/MER:  Claimant should be capable of @ least sedentary work."  (R. 160).  Unfortunately, the medical consultant's handwritten comments/conclusions found at the bottom of the summary are illegible.  (R. 160).

A second DDS Case Summary dated January 7, 2003 contains the non-medical examiner's conclusion,

> Since initial denial to a sedentary RFC. [sic]
> Claimant has had lumbar fusion surgery on
> 11/27/02 and he is improving, so it would
> appear that a durational denial to a light
> RFC by 11/27/03 is more appropriate."
> (R. 229).

The medical consultant's written remarks, dated March 14, 2003, which are partially unreadable, conclude with, "should be able to do light level activity within 12 months of back surgery." (R. 229).

The ALJ's formal opinion relies on these summaries in rejecting Claimant's application for benefits.  (R. 18).


## DISCUSSION

To determine whether an individual suffers from a disability under the regulations, the ALJ must conduct a sequential five-step evaluation.[11]  The burden of proof lies with the Claimant as to steps one through three; at steps four and five the burden shifts to the commissioner.

---

[11]See 20 C.F.R. §§ 404.1520 (a)-(f)

In the first two steps, the ALJ determines whether the Claimant has engaged in substantial gainful activity, and whether the Claimant has a "severe" impairment.[12]  If the Claimant has satisfied the first two requirements, the evaluation moves on to step three, a determination of whether the Claimant's impairments meet or equal a disability described in the Listing of Impairments ("Listings").[13]  If the ALJ determines the Claimant has an impairment which meets or equals the Listings, the ALJ must conclude the Claimant is disabled.

In this case, the ALJ found at step one that Mr. Lewis has not engaged in substantial gainful activity for the requisite time.  The ALJ found Claimant met the insured status requirements of the Act for a closed period of time, from January 25, 2002 through September 30, 2004.  (R. 15).

At step two, the ALJ found Claimant suffers from severe impairments:  obesity, apnea and a back disorder.  (R. 15-18, 20).  However, the ALJ found at step three that based on the medical evidence established, Mr. Lewis did not have an impairment or combination of impairments listed in or medically equal to a listed impairment.  (R. 20).  The ALJ further found Claimant's allegation that his impairments prevent his ability to work not credible or fully persuasive.  (R. 20).

---

[12]See 20 C.F.R. §§ 416.920(d)

[13]See 20 C.F.R. §§ 416.920(d)

The ALJ found that Claimant retains a residual functional capacity (RFC) to occasionally lift up to 20 pounds in jobs that permit a sit-stand option, sit for one hour at a time and up to six hours in a workday, walk up to 30 minutes and stand up to 15 minutes at a time for up to 2 hours in a workday, perform jobs that permit mildly reduced concentration where he can lie down for up to one hour per day using only scheduled breaks and lunches, and occasionally bend, twist and stoop in jobs where he can "avoid hazardous machinery."[14]   (R. 20).

The ALJ found Claimant cannot perform his past relevant work, is a younger individual, and has no transferable skills. (R. 20-21).

Finally, at step five the ALJ ruled that although Mr. Lewis' additional limitations do not allow him to perform a full range of sedentary work, there are a significant number of jobs available in the national economy he can perform:  charge account clerk, order clerk and office helper.  (R. 21). Claimant can perform jobs permitting up to 24 unexpected absences per year.  (R. 20-21).

Based upon these findings, the ALJ determined Mr. Lewis was not disabled within the meaning of the Act.  (R. 21).

---

[14]The relevance of "avoiding hazardous machinery" is left unexplained by the ALJ.

21

Claimant challenges the decision of the ALJ. He argues the ALJ erred by finding Claimant suffered from severe impairments for a closed period of time, failed to give proper weight to the opinions of Mr. Lewis' treating physicians and failed to find Claimant's testimony as to his limitations fully credible resulting in an incorrect decision as to his ability to perform available work.

### *Step One Analysis*

Social Security regulations define "disability" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. 404.1505(a).

Claimant argues the ALJ erred at step one by failing to address his argument raised in briefing and during the hearing that he should be granted benefits for at least the closed period from January 25, 2002, through June, 2003, when his back fusion was determined by Dr. Reichman to be solid. (R. 111, 270-271). A review of the record supports Lewis' argument. (R. 16-17). The ALJ's opinion does not address the issue but rather finds, "The Claimant has not engaged in any substantial gainful activity January 25, 2002, [sic], the date

22

that disability is alleged, and continuing through the date of
this decision." (R. 20).

Upon remand, the ALJ should consider all issues related to
a closed period of benefits.

### *Step Three Analysis*

Claimant argues the ALJ erred at the third step of the
analysis by failing to give proper weight to the opinion of his
treating physician and by failing to find Claimant's testimony
as to his limitations fully credible or persuasive.

At step three, Claimant has the burden of proving his
impairment or combination of impairments is "equivalent" to a
listed impairment. "[H]e must present medical findings equal in
severity to all the criteria for the one most similar listed
impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990)
(emphasis in original). However, regulations 20 C.F.R. §§
494.1526 and 416.926 require the Commissioner to decide whether
a Claimant's impairment is medically equivalent to a listed
impairment "if the medical findings are at least equal in
severity and duration to the listed findings." Furthermore,
medical equivalence of a listed impairment may be found when a
combination of impairments, none of which meet or equal a listed
impairment, when combined are termed to be medically equivalent
to any listed impairment based upon the symptoms, signs, and
laboratory findings for each one of the combination of

impairments.  20 C.F.R.  § 404.1526(a); See 70 Am. Jur. 2d.
Social Security and Medicine § 800.

If at step three a determination is made that Claimant's
impairment or combination of impairments is equivalent to a
listed impairment, Claimant is determined disabled within the
meaning of the Act and further analysis becomes unnecessary.

The Commissioner's regulations provide that the
determination of whether a particular medical condition meets or
equals a listed impairment is a medical judgment, made at the
initial and reconsideration levels by the Commissioner's
designated physicians and consultative medical specialists.  See
C.F.R. § 404.1526.

Here, the ALJ found the medical evidence established severe
obesity, apnea and a back disorder but Mr. Lewis failed to prove
an impairment or combination of impairments equaling a listed
impairment.  (R. 20).  The ALJ rejected the opinions of Dr.
Reichman and found Claimant's testimony not fully credible or
persuasive.  The ALJ wrote that Claimant was known to have a
remote history of lumbosacral spine surgery with a work related
exacerbation of his lumbosacral complaints in 2001.  (Emphasis
added).  (R. 16).  The opinion cited Claimant's treatment
history for back problems with Dr. Bacon, Dr. King, Dr. Reichman
and Dr. Watkins.  The ALJ notes that in January, 2002, the month
his disability is alleged, Claimant began seeking additional

24

treatment and care.  (R. 16).  The opinion states that after
examination in early 2002, Dr. Bacon reported Claimant was
neurologically intact with negative straight leg raising and
that Mr. Lewis was encouraged to return if his symptoms worsened
and he should engage in strengthening therapy.  (R. 16).  The
opinion does not acknowledge Dr. Bacon as Claimant's initial
back surgeon.  (R. 16).

The ALJ's opinion then states that Dr. King "examined the
Claimant briefly in February 2002, . . . . and [he] walked with
a straight back and exhibited difficulty with sitting and
standing."  The opinion acknowledges that after ordering and
reviewing a negative lumbosacral spine series as well as an
electronyographic study, Dr. King diagnosed bilateral lumbar
radiculopathy without evidence of polyneuropathy, concluded
surgery was the best option for Claimant and referred Claimant
to Dr. Reichman.  (R. L6-17; 4F; 6F).

In reference to Dr. Reichman's treatment of Claimant, which
included the performance of the two surgeries in 2002, the last
of which was performed three months prior to Claimant's alleged
onset of disability in January, 2003, the ALJ's opinion states,
in pertinent part:

> The claimant came under the care of Howard
> Reichman, M.D. and Daniel Faber, M.D. on
> referral . . . . Examination showed negative
> Romberg and decreased ankle flex on the
> right.  Gait was antalgic and flexion was
> limited in the spine.  Cerebellar coordination

25

and sensory exams were unremarkable.  <u>Dr.
Reichman concluded that the claimant could
not work</u> and that the claimant required
surgical decompression.  <u>Dr. Reichman would
later offer a similar statement in November
2002.</u>  The Administrative Law Judge observes
that disability determinations are complex
matters involving many factors including age,
education and vocational history.  <u>Dr.
Reichman's observation is conclusory,
non-specific and it is an opinion reserved to
the Commissioner</u> . . . . The Regulations and
applicable case law provide that the opinions of
treating sources, such as Dr. Reichman, can be
afforded special consideration when those
opinions are well supported.  <u>However, at this
point Dr. Reichman's association with the
claimant was quite brief and his clinical records
fail to reveal the type of significant clinical
and laboratory abnormalities one would expect
if the claimant were precluded from all
activity in the world of work on an enduring
basis.  It is likely that Dr. Reichman is
unfamiliar with the definition of disability
under the Social Security Act.  Specifically,
it is possible that Dr. Reichman was
referring solely to an inability to perform
the claimant's more demanding work with tow
trucks that he had been performing in the
recent months and years.  Regardless, Dr.
Reichman's conclusory medical source statement
regarding the claimant's inability to work
is unsupported by the objective clinical
record and it is given no weight</u>. . . .  (Emphasis

added).  (R. 17-18).


     The official court record reveals Dr. Reichman was

Claimant's primary treating physician and surgeon for 20 months

immediately preceding the hearing before the ALJ.  In treating

Mr. Lewis, the doctor reviewed previous MRIs, surgical and other

relevant medical records and ordered new testing.  Dr. Reichman

26

performed two back surgeries for Claimant within one year and oversaw his recovery.  He prescribed Mr. Lewis' medications and made observations as to his pain levels and physical limitations including his inability to work.  Yet, the record does not contain any request by the ALJ for Dr. Reichman's testimony, or additional information or clarification as to the doctor's qualifications to determine Claimant's medical condition, ability to work and level of disability.  The ALJ's opinion does not consider Claimant's recovery time or problems after having had two surgeries in less than one year.  (R. 14-21).  Rather, the ALJ disregards Dr. Reichman's opinions, giving them "no weight" and instead relies on two DDS case summaries, one of which contains the conclusions of a non-examining physician, and the other appears to agree with Dr. Reichman that Claimant is unable to work.

Generally, the Social Security Administration gives more weight to the opinion of an examining physician than to that of a non-examining physician.  20 C.F.R. § 416.927(d)(1); Winfrey, 92 F.3d at 1022; see also Robinson v. Barnhart, 366 F. 3d 1078, 1084 (10th Cir. 2004).  If not given controlling weight, the opinion of a treating physician is still entitled to deference and must be weighed according to the factors of 20 C.F.R. 404.1527 which are:

> (1) the length of the treatment relationship
> and the frequency of examination; (2) the

27

> nature and extent of the treatment relationship,
> including the treatment provided and the kind of
> examination performed; (3) the degree to which
> the physician's opinion is supported by
> relevant evidence; (4) consistency between
> the opinion and the record as a whole; (5)
> whether or not the physician is a specialist
> in the area upon which an opinion is rendered;
> and (6) other factors brought to the ALJ's
> attention which tend to support or contradict
> the opinion.

The ALJ must give "good reasons" for the weight given.  If the doctor's opinion is rejected completely, he must give "specific, legitimate reasons."  "'In choosing to reject the treating physician's opinion, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.'"  Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002).

"If evidence from a Claimant's treating doctor is inadequate to determine if the Claimant is disabled, an ALJ is required to recontact a medical source, including a treating physician, to determine if additional needed information is readily available . . . .  The responsibility to see that this duty is fulfilled belongs entirely to the ALJ; it is not part of Claimant's burden."  Robinson v. Barnhart, 366 F.3d at 1084.

Claimant's argument that in this case the ALJ failed to recontact Dr. Reichman for testimony, supplemental information or clarification, failed to engage in the required analysis before rejecting out of hand Dr. Reichman's opinions, gave the doctor's opinions "no weight," and failed to cite legitimate reasons for rejecting the doctor's opinions is persuasive.  The court finds that the ALJ erred in rejecting the treating physician's opinion.  The issue of the quality and weight to be given Dr. Reichman's opinions remain an open question leaving the record without substantial evidence to support the ALJ's decision.

## *Claimant's Credibility*

The ALJ found Claimant not fully credible as to his limitations.[15]  (R. 20).  The ALJ found "the Claimant's allegation that his impairments produce symptoms and limitations of sufficient severity to prevent all sustained work activity is not credible or fully persuasive for the reasons set forth in the body of this decision."  (R. 20).  The ALJ cites as not fully persuasive Claimant's statements that:

> [He] has the ability to perform a combination of sitting, standing and walking during the day.
> However, his allegation that he has to lie down for much of the day is not fully persuasive.  He is

---

[15]Although bases for the ALJ's decision regarding credibility are found within the body of the opinion, it would be helpful for the reviewing court if they were delineated with particularity in the findings.

> apparently able to cook, shop for groceries, carry
> lighter bags of groceries, help put groceries away,
> mop and perform less than moderate to heavy cleaning.
> . . . (R. 16).

In another portion of the opinion the ALJ states:

> . . . [his] allegation that he has to lie down for
> much of the day, or after any brief period of
> activity, is not persuasive.  It is also noted that
> the claimant's work record is not full and it does not
> reflect a sustained interest in gainful employment
> over the years.  See Exhibit Section D.  This raises
> the possibility there are reasons other than the
> claimant's impairments for his current lack of
> employment or self-employment.  (R. 19; see also
> Exhibit D, Non-Disability Development Applications,
> Earnings and other Benefits, (R. 54-56)).

The opinion further noted that "The Claimant sat quietly and

comfortably throughout the hearing while reporting level 5

pain . . . ."  (R. 19).  No mention was made in the opinion of

Mr. Lewis' request to stand during the hearing.  The record does

not reflect any inquiry during the course of the hearing as to

whether Claimant was comfortable before or during the hearing.

   "Credibility is the province of the ALJ."  Hamilton v.

Secretary of Health & Human Servs., 961 F.2d 1495, 1499 (10th

Cir. 1992).  The credibility determination, however, must be

supported by substantial evidence.  Kepler v. Chater, 68 F.3d

387, 391 (10th Cir. 1995).  A reviewing court should "generally

treat credibility determinations made by an ALJ as a finding

upon review" where, the ALJ has given specific, legitimate

reasons for disbelieving the Claimant's testimony.  Goss v.

Bowen, 862 F.2d 802, 807 (10th Cir. 1988).  Nonetheless, the

ability of Claimant to care for himself, drive, perform
housework, attend school, attend social activities, have
hobbies, and do shopping does not, *per se*, disprove disability.
See <u>Biri v. Apfel</u>, 4 F. Supp. 2d 1276, 1279 (D. Kan. 1998);
<u>Pinnt v. Chater</u>, 988 F. Supp. 1354, 1359 (D. Colo. 1997), citing
20 C.F.R. § § 404.1572©; 416.972©.  Further, when determining
credibility, the ALJ should consider a number of factors
including, although not limited to, levels and effectiveness of
medications, the frequency of medical contacts, the nature of
daily activities, subjective measures of credibility and the
consistency or compatibility of non-medical testimony with
objective medical evidence.  See <u>Thompson V. Sullivan</u>, 987 F.2d
at 1489.  The ALJ must explain why specific relevant evidence
led him to conclude the Claimant's subjective complaints were
not credible.  <u>Kepler v. Chater</u>, 68 F. 3d 387, 391 (10th Cir.
1995).

In making a decision concerning Claimant's credibility, the
ALJ relies on Claimant's abilities to perform the daily
activities described above.  However, as stated in case law and
regulations, the ability to perform these activities, per se, is
an insufficient basis for concluding Claimant's testimony
concerning disability is not credible.  The record contains no
indication of the analytic process engaged in by the ALJ.  The
ALJ must show support within the record to conclude the Claimant

is not credible.  Here, the ALJ's findings are not supported by substantial evidence within the record.

### *Step Five Analysis*

The ALJ found that Mr. Lewis cannot perform his past relevant work.  (R. 13, 21).  At step five of the analysis, the ALJ did find Mr. Lewis would regain a residual functional capacity for a range of light or sedentary work.  (R. 18, 160-169, 229 - 238).

Because open questions are to be addressed as to the appropriate weight to be given Dr. Reichman's opinion as to whether or not Claimant is able to work, the ALJ's conclusions as to Claimant's RFC are not now supported by substantial evidence in the record.

If, upon remand, Mr. Lewis is again determined not to be disabled, the current record supports the finding of the ALJ at step five that Claimant is "not disabled" where he can, as testified to by the vocational expert, perform a significant range of sedentary work which is available in significant numbers in the national economy.  (R. 21).  See e.g. Winfrey, 92 F.3d at 1024 ("the ALJ may rely on information supplied by the VE at step four").

32

## RECOMMENDATION

As discussed above, there is not substantial evidence in the record to support the decision of the ALJ to deny benefits. If Claimant is found to have impairments that equal a 1.07 or other Listing, he should be awarded benefits.

This court, therefore, recommends that Claimant's request for remand should be granted. The ALJ should reconsider Dr. Reichman's opinions, or ask for testimony or clarification consistent with this opinion or should grant Mr. Lewis benefits.

Copies of the foregoing report and recommendation are being mailed to all parties who are hereby notified of their right to object. The parties must file any objection to the Report and Recommendation within ten (10) days after receiving it. Failure to object may constitute a waiver of objections upon subsequent review.

DATED THIS _____ day of October, 2005.

BY THE COURT

BROOKE C. WELLS
United States Magistrate Judge

33